Affirmed and Memorandum Opinion filed September 24, 2009.

 

 

 

                                                                                    In
The

 

Fourteenth Court of
Appeals

_______________

 

NO. 14-08-00201-CR

_______________

 

PETER CORBO, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

                                                                                                              

On Appeal from the 262nd District Court

Harris County, Texas

Trial Court Cause No. 1115011

                                                                                                             


 

M E M O R A N D U M  O P I N I O N

A jury found appellant, Peter Corbo, guilty of sexual assault
and, after finding two enhancement paragraphs were true, assessed punishment of
twelve years= confinement.  In three issues, appellant contends the evidence was
legally and factually insufficient to support his conviction and the trial
court erred by admitting evidence of extraneous offenses during the
guilt-innocence phase.  Because all dispositive issues are settled in law, we
issue this memorandum opinion and affirm.  See Tex. R. App. P. 47.4. 

 








I.  Background

On the night of December 14, 2005, the nineteen-year-old
complainant, C.H., and her friends, Lindsey Hoffart and Luke Husband, visited a
bar owned by appellant, where C.H. was previously employed.  Appellant does not
dispute he had sexual intercourse with C.H. that night.  Indeed, several months
later, when C.H. learned she was pregnant, medical personnel estimated December
14, 2005 as the date of conception, and DNA testing confirmed appellant was the
father.  However, C.H. claimed the intercourse occurred after appellant placed
a drug in her drink which rendered her unconscious.  Conversely, appellant
claimed the intercourse was consensual.  At trial, the parties presented
numerous witnesses, including the following.  

A.        The State=s Witnesses

Among others, C.H., Luke Husband, Lindsey Hoffart, Cynthia
Hoffart (C.H.=s mother), Luis Hernandez (a bar employee), Rachel Jackson (C.H.=s best friend), and Julian Rossi
(C.H.=s employer) testified regarding the
night at issue and the following morning. 








According to the State=s evidence, C.H. and her friends
first visited another establishment where she consumed at least four beers. 
Subsequently, when they entered appellant=s bar, he offered them drinks and
gave C.H. a beer and a AYager@ shot.  Appellant then invited C.H. and Lindsey to enter an
office located in the bar, but appellant forbade Luke from entering.  C.H.
could not definitely recall consuming more drinks in the office, but Lindsey
suggested they both drank three or four shots.  Lindsey eventually returned to
the main bar area to socialize with Luke.  They did not see C.H. again that
evening.  At closing time, they were instructed to leave.  They waited outside
for C.H., but she never appeared.  Lindsey was finally allowed to enter and
look for C.H. but could not find her.  C.H.=s car was still in the parking lot
with her purse and cell phone inside, which  Lindsey considered abnormal
because C.H. was the group=s driver, and, as Cynthia Hoffart and Rachel Jackson also
confirmed, C.H. always carried her cell phone.  Finally, another patron drove
Lindsey and Luke home where they arrived at about 4:00 a.m.  They reported to
Cynthia, who lived next door, that C.H. had not exited the bar. 

In the morning, Cynthia twice went to the bar to search for
C.H and also called the police and C.H.=s father.  Luis Hernandez, who was
cleaning the bar, allowed Cynthia to search inside.  At some point while
Cynthia was at the bar, Hernandez reached appellant by telephone.  According to
Hernandez, appellant said C.H. was not with him, he did not know her
whereabouts, and she had left with some friends.  C.H. then called Cynthia from
appellant=s phone number to report she was alright, which Cynthia considered an
unusual statement.  Cynthia demanded that appellant return C.H. to the bar
within fifteen minutes.  When she had not arrived, Cynthia called the number
again and was told by appellant that no one was at his house and he did not
know someone with C.H.=s name.  Cynthia confronted him that this statement was false
and again insisted he return C.H. 

Meanwhile, C.H. remembered sitting in the bar office, but
then her memory Alike blacked out,@ although she recalled vomiting at
one point.  The next event she recalled was waking up on a couch at appellant=s house and he was the only person
there.  She did not understand how she got to his house and was scared, very
tiredCAlike out of it,@ and nauseous.  Appellant instructed
her to call her mother but use A*67,@ which would prevent his number from display on the recipient=s phone.  C.H. did not use A*67@ because she wanted her mother to know
her location, but she lacked any memory regarding the details of their
conversation.  C.H. also called Rachel Jackson from a number Rachel did not
recognize.  According to Rachel, C.H. asked Rachel to meet her at a grocery
store, stating she had been with appellant and he did not want to take her to
the bar because her mother was waiting there.  Rachel drove to the store, where
C.H. was seated in appellant=s truck.  Rachel took C.H. to the bar, where she argued with
her mother who was waiting there. 








Cynthia and Rachel described C.H.=s unusual demeanor on the phone and
in person that morning as unfocused, disheveled, Adraggy,@ Akind of blank looking,@ Areal slow,@ Aout of it,@ and unable to complete a
conversation.  Similarly, Julian Rossi, C.H.=s employer, testified that, when C.H.
reported to work later that morning, she was Acrying, shaky, didn=t really say much,@ which was not her normal behavior,
and slept through part of the workday.

Several days later, C.H.=s mother persuaded her to have
testing performed. C.H. suspected she had been drugged because she had never
blacked out such that she forgot the events of an entire evening or felt so Aout of it@ the next day.  The results of a
urine test were negative.  Although C.H. had soreness in her vaginal area, she
declined a rape kit because she did not want to think Aanything happened@ to her.  Several months later, when
C.H. learned she was pregnant with appellant=s child, she became very upset and
realized she had been raped.  Subsequently, she had a flashback, in which she
was at appellant=s house, a spotlight shone on her, appellant was on top of
her, and she could not move and was crying.              C.H. testified that,
on the night at issue, she was unable to physically resist any sexual attack,
was unconscious when she had intercourse with appellant, would not have
consented to this act, and, contrary to his later testimony, did not perform
oral sex on him.

The State also presented testimony from four other women regarding
encounters with appellant which are pertinent to the issues on appeal.

S.E.








S.E. met appellant on November 9, 2004 when he agreed to hire
her.  That night, while S.E. socialized at the bar, appellant handed her a
drink which contained a shot glass.  When S.E. took a sip, appellant insisted
she finish the drink and pushed it up to her mouth, so she complied.  She did
not remember leaving the bar.  Her next memory was an experience which felt
like a nightmare because she was lying down and had pain in her Aprivates.@  She eventually woke in appellant=s bed, wearing only a bra and unable
to move.  She was delivered to a relative=s house, wearing only a t-shirt, but
she did not know how she got there.  Subsequent hospital testing confirmed S.E.
had sex with appellant, but no date-rape drug was detected in her system.  When
she later asked appellant what happened, he replied that they Ahad a lot of fun.@  S.E. did not consent to sex that
night and believed she was unconscious at the time.  Appellant was charged with
sexual assault of S.E. but pleaded guilty to the misdemeanor offense of
unlawful restraint. 

S.L.

In 2006, S.L. worked for appellant as a bartender.  She
recalled a time when she finished her dayshift and drank a coke, which had been
placed in the area where appellant sat.  S.L. then felt lightheaded and
nauseous and thought she might black-out, so she called a friend, who took her
home, where she slept for more than a day.  On a previous occasion, not
involving appellant, she tested positive for the date-rape drug, GHB, and the
symptoms on both occasions were similar.  

D.L.

D.L. worked at the bar briefly during 2006.  One night, while
she was off work but drinking at the bar, appellant made her a shot.  Shortly
after consuming the drink, she felt Avery heavy, kind of sick, kind of
sleepy.@  Her friend drove her home, but she
did not remember any events after leaving the bar.  She thought her condition
was the result of Asomething@ in her drink, as opposed to excessive alcohol.

S.C. 








S.C. was appellant=s friend in the mid-nineties, and
they frequented bars together.   She recalled one night when her last memory
was consuming her second drink at the bar they visited.  She next remembered
waking naked in appellant=s bed at his then home, which was thirty miles from the bar,
and feeling Adraggy@ with a headache.  S.C. now believes appellant drugged her although she
did not realize so at the time.  Another time, S.C. and her date went to a
different bar where appellant was present.  For some reason, she and appellant
talked in the kitchen.  Her next memory was waking in his bed, but she was
clothed this time.  

Further, Dr. Ashraf Mozayani, chief toxicologist of the
Harris County Crime Lab and an expert in drug-facilitated sexual assaults,
testified some such drugs have a short Ahalf-life@ and do not stay in the body long
enough for detection through laboratory testing once a suspected assault is
reported; for example, GHB, leaves a victim=s system before she wakes.  Dr.
Mozayani opined C.H.=s urine test was performed too late after the incident, and
at a threshold level too high, to necessarily detect such drugs.  

B.        Appellant=s Witnesses

Appellant testified that, on the night at issue, he greeted
C.H. and her friends. C.H.  asked about the possibility of returning to her job
and about any openings for her friend.  Appellant responded that the bar was
fully staffed but he would discuss the matter.  They went to the office to get
an application.  For the remainder of the evening, they both mingled with
various guests.  Around midnight, appellant and C.H. began acting amorously
toward each other.  At some point, they went to his truck where they  kissed
and C.H. performed oral sex on appellant until they were interrupted by a
person walking nearby.  








C.H. exited the truck and talked to her friends.  She then
returned and suggested they go to appellant=s house.  After taking an employee
home, appellant drove C.H. to his house. They had sexual intercourse twice in
his bedroom.  C.H. was awake and involved in the encounter.  They fell asleep,
and he later woke when Hernandez called to report C.H.=s mother was looking for her. 
Appellant woke C.H. and told her to call her mother.  C.H. first called a
friend followed by her mother.  Appellant drove C.H. to the grocery store but
claimed it was not his idea that she meet her friend there.  En route, C.H.
asked her friend via telephone to claim C.H. had been with the friend that
night.  Appellant testified he has never drugged a woman, caused a woman to
become unconscious and then had sex with her, or taken advantage of an
unconscious woman.  He claimed his sexual activity with S.E. was consensual but
he pleaded guilty to the reduced charge because he was concerned about his
existing criminal record.

Appellant also presented several witnesses who were bar
employees and/or appellant=s friends at various times.  Olivia Jolly testified appellant
took her home on the night at issue, C.H. was in the vehicle and did not appear
incoherent or highly intoxicated.  Andrew Prince claimed he gave a man and a
woman a ride home that night because their friend, a woman who was with
appellant, had driven them there, and she acknowledged they were leaving. 
Robert Dixon, the bar doorman, saw appellant leave with a young woman who
appeared unimpaired.  Kimberly Kelly went to appellant=s house late that night, conversed
with appellant and C.H. while they were in his bedroom, and C.H. was Avery coherent.@    

William Oliver, the bar=s co-owner and appellant=s long-time friend, testified C.H.
and both her female friend and male friend entered the bar=s office that night.  After closing
time, Oliver saw appellant and C.H. in appellant=s truck outside the bar with C.H.=s head Adown toward@ appellant=s lap.  When Oliver approached,
appellant rolled down the window and C.H. sat up.  C.H. exited the truck, spoke
with her friends, and returned to the truck.  C.H. was able to walk and was not
Auncoordinated.@ 

II.  Sufficiency of the Evidence

In his first and second issues, appellant contends the
evidence was legally and factually insufficient to support his conviction.  

A.        Standard of Review








In considering a legal-sufficiency challenge, we review all
evidence in the light most favorable to the finding to determine whether, based
on that evidence and reasonable inferences therefrom, any rational trier of
fact could have found the essential elements of the offense beyond a reasonable
doubt.  Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).  We
must give deference to the responsibility of the trier of fact to fairly
resolve conflicts in testimony, weigh the evidence, and draw reasonable
inferences from basic facts to ultimate facts.  Id.  We ensure only that
the jury reached a rational decision and do not act as second arbiter of the
weight and credibility of testimony.  Muniz v. State, 851 S.W.2d 238,
246 (Tex. Crim. App. 1993).  

In examining a factual-sufficiency challenge, we view all
evidence in a neutral light and set aside the verdict only if (1) the evidence
is so weak that the verdict seems clearly wrong or manifestly unjust or (2) the
verdict is against the great weight and preponderance of the evidence.  Marshall
v. State, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006); Watson v. State,
204 S.W.3d 404, 414B15 (Tex. Crim. App. 2006); Cain v. State, 958 S.W.2d
404, 407 (Tex. Crim. App. 1997).  While we are permitted to substitute our
judgment for the jury=s when considering credibility and weight determinations, we
may do so only to a very limited degree and must still afford due deference to
the jury=s determinations.  Marshall,
210 S.W.3d at 625.

Additionally, circumstantial evidence is as probative as
direct evidence, and can alone be sufficient, to establish guilt. Hooper,
214 S.W.3d at 13.  In reviewing sufficiency of the evidence, we consider events
occurring before, during, and after commission of the offense and may rely on
actions of the defendant which show an understanding and common design to do
the prohibited act.  Id.  Each fact need not point directly and
independently to the guilt of the appellant, as long as the cumulative force of
all the incriminating circumstances is sufficient to support the conviction.  Id.

B.        Analysis








A person commits sexual assault if he Aintentionally or knowingly . . .
causes the penetration of the . . . sexual organ of another person by any
means, without that person=s consent.@  Tex. Penal Code Ann. ' 22.011(a)(1)(A) (Vernon Supp.
2008).  Appellant does not dispute he penetrated C.H.=s sexual organ.  Rather, he
challenges sufficiency of the evidence to support the lack-of-consent element. 
The jury was instructed this element meant that Athe other person has not consented
and the actor knows the other person is unconscious or physically unable to resist@ or Athe other person has not consented
and the actor knows the other person is unaware that the sexual assault is
occurring.@  See id. ' 22.011(b)(3), (5).  We conclude the evidence was sufficient
to prove lack of consent under either definition. 

Appellant contends he was convicted Aentirely on speculation@ because there was no laboratory
proof he drugged C.H. or any other women, no witness saw appellant place a drug
in their drinks, and no evidence showed he ever possessed any Adate rape@ drugs.  However, Dr. Mozayani=s testimony demonstrated that lab
testing, and specifically C.H.=s urine test, would not necessarily confirm a
drug-facilitated sexual assault.  Further, a conviction for sexual assault is
supportable on solely the testimony of the victim if, as here, the victim
informed any person, other than the defendant, of the offense, within a year
thereof.  Tex. Code Crim. Proc. Ann. art. 38.07(a) (Vernon 2005).  Therefore,
absence of the type of corroboration cited by appellant did not render the
evidence insufficient to support his conviction.

In fact, appellant=s conviction was not based solely on
C.H.=s testimony.  Instead, the jury could
have reasonably concluded the intercourse was non-consensual based on the
cumulative force of the following:

!       
C.H. testified appellant gave her
drinks at the bar, she was in his office at her last memory of consciousness,
she later woke on the couch at his home having engaged in intercourse with him,
and she subsequently experienced a flashback of appellant on top of her;

!       
Dr. Mozayni opined it is a typical
for a victim of drug-facilitated sexual assault  to remember entering the bar
where she was drugged, lose memory of the following several hours, be moved
from one location to another, and later experience flashbacks of the assault;








!       
C.H.=s leaving her friends and her car, containing her purse and cell phone,
at the bar, contrary to normal behavior, supported an inference she did not
leave voluntarily or was incoherent at the time;

!       
the descriptions by C.H.=s mother, best friend, and employer of her unusual
demeanor following the incident supported her belief she was drugged;

!       
the jury could have questioned
appellant=s intent towards C.H. based on his insistence that
Luke could not enter the office with C.H. and her female friend;

!       
the following words and actions by
appellant indicated consciousness of guilt:  instructing C.H. to use A*67@ when she
called her mother; falsely claiming to Luis Hernandez and C.H.=s mother he knew no one by C.H.=s name and/or she was not with him; and delivering
C.H. to her friend at a grocery store instead of the bar where her mother and
others were searching for her.  See King v. State, 29 S.W.3d 556, 565
(Tex. Crim. App. 2000) (recognizing, when conducting sufficiency review, that
jury may consider evidence showing consciousness of guilt).

!       
after consuming
drinks prepared by, or placed near, appellant, four other women experienced
symptoms similar to those described by C.H.Cfeeling sick or Adraggy@ and effectively blacking out or
losing memory of events during a certain time periodCand one such encounter (with S.E.)
resulted in sexual intercourse; although these encounters did not all lead to
sexual activity, the jury could have reasonably considered that they indicated
appellant=s modus operandi of drugging women to at least attempt sexual
activity. See Martin v. State, 173 S.W.3d 463, 468 (Tex. Crim.
App. 2005) (recognizing, in context of extraneous offenses, modus operandi refers
to defendant=s distinctive and idiosyncratic manner of committing criminal acts, and
may be relevant to prove intent or lack of consent under Adoctrine of chances@Cthe principle that evidence of
repetition of similar unusual events over time demonstrates a decreasing
probability those events occurred by chance).

Appellant also contends the testimony of his witnesses who
claimed C.H. was coherent around the time she and appellant had intercourse
supports his claim it was consensual.  However, the jury was free to believe
C.H.=s testimony that she was unconscious
and did not consent.  The jury was also free to believe the State=s other witnesses despite some
conflicts in pertinent respects with the testimony of appellant and his
witnesses. We find no reason to intrude on the jury=s role to evaluate the credibility of
witnesses. 








Appellant also argues C.H.=s judgment was affected by the large
quantity of alcohol she consumed.  It is not clear whether appellant contends
C.H.=s alcohol consumption facilitated her
consent to intercourse or caused an inability to remember consensual
intercourse.  Nevertheless, the evidence established she is a heavy drinker who
can Ahold her liquor.@  C.H. explained that heavy drinking
does not render her incapacitated or incapable of remembering events from the
preceding evening.  In particular, she did not believe her alcohol consumption
that night caused her to black out.  Moreover, C.H.=s mother and Rachel Jackson explained
that C.H.=s unusual demeanor on the morning after the incident was different than
her behavior when intoxicated.  Appellant further stresses that C.H.=s mother=s anger over her failure to come home
that night was a Amotive@ for C.H. to lie about the incident.  However, her mother=s anger, as well as the amount of
alcohol C.H. consumed, were merely matters concerning her credibility which the
jury was free to consider.

Finally, we conclude that, even if the evidence were
insufficient to prove appellant drugged C.H., her testimony she was unconscious
at the time of the intercourse and did not consent, regardless of the reason
for the unconsciousness, was sufficient to prove lack of consent.  In sum, a
rational trier could have found beyond a reasonable doubt that C.H. did not
consent to intercourse with appellant and either appellant knew she was Aunconscious or physically unable to
resist@ or knew she was Aunaware that the sexual assault [was]
occurring.@  See Tex. Penal Code Ann. ' 22.011(b)(3), (5).  Additionally,
the evidence supporting the lack-of-consent element was not so weak that the
finding seems clearly wrong or manifestly unjust and the finding was not
against the great weight and preponderance of the evidence.  We overrule
appellant=s first and second issues.

III.  Admission of Evidence








In his third issue, appellant contends the trial court erred
by Aoverruling the defense objection to
admission of extraneous acts.@  Appellant references an objection he lodged after the
testimony of S.E., but before the testimony of S.L., D.L., and S.C.  Although
all four women testified regarding encounters with appellant, he asserts on
appeal the State called Athree girls to testify that they believed that [appellant]
had drugged them.@  Appellant does not specifically identify the Athree@ women to whom he refers; however, he
apparently recognizes any complaint regarding S.E.=s testimony was waived by the failure
to timely object and challenges admission of only the testimony of S.L., D.L.,
and S.C.  See Tex. R. App. P. 33.1(a) (providing, party must make
timely, specific objection to preserve error for appellate review);  Berry
v. State, 233 S.W.3d 847, 857 (Tex. Crim. App. 2007) (holding defendant
failed to preserve complaint because she first objected after witness answered
question about extraneous matter at issue).[1]

Appellant suggests the testimony of these three women was
inadmissible under Texas Rules of Evidence 404(b) and 403.  Rule 404(b)
provides that evidence of other crimes, wrongs, or bad acts committed by the
accused are not relevant to prove his character to show action in conformity
therewith, but may be relevant for other purposes, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of
mistake or accident.  See Tex. R. Evid. 404(b).  Under Rule 403,
relevant evidence may nonetheless be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue delay, or needless
presentation of cumulative evidence.  Tex. R. Evid. 403.








Courts should balance the following factors under a Rule 403
analysis:  (1) the inherent probative force of the proffered evidence along
with (2) the proponent=s need for that evidence against (3) any tendency of the
evidence to suggest decision on an improper basis, (4) any tendency of the
evidence to confuse or distract the jury from the main issues, (5) any tendency
of the evidence to be given undue weight by a jury that has not been equipped
to evaluate its probative force, and (6) the likelihood that presentation of
the evidence will consume an inordinate amount of time or merely repeat
evidence already admitted.  Gigliobianco v. State, 210 S.W.3d 637, 641B42 (Tex. Crim. App. 2006).

We review a trial court=s ruling on admission of evidence for
abuse of discretion.  Bargas v. State, 252 S.W.3d 876, 889 (Tex. App.CHouston [14th Dist.] 2008, no pet.)
(citing Moses v. State, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). 
The trial court does not abuse its discretion if its ruling is within the zone
of reasonable disagreement.  Id. (citing Moses, 105 S.W.3d at
627).

We note appellant did not object on Rule 404(b) grounds. 
Rather, his entire objection was Athat it=s . . . overly prejudicial,@ which arguably was sufficient to
preserve error on only the Rule 403 complaint.  Nonetheless, in this case, the
Rule 403 balancing test somewhat encompasses a relevancy analysis because
determining whether the probative value of the evidence was outweighed by the
danger of unfair prejudice necessitates recognizing the purpose for which the
evidence was admitted.  Further, the trial court overruled appellant=s objection by indicating the
evidence was relevant without mentioning the Rule 403 ground.[2] 
Regardless, when the record is silent regarding the trial court=s balancing of the Rule 403 factors,
we presume it conducted the test.  Bargas, 252 S.W.3d at 893 (citing Williams
v. State, 958 S.W.2d 186, 195B96 (Tex. Crim. App. 1997)).  








With respect to the first two factors of the balancing test,
as we have explained, lack of consent was an element of the offense and the
issue was hotly disputed.  Appellant raised his consent defense as early as his
opening statement.  See Bass v. State, 270 S.W.3d 557, 563 (Tex.
Crim. App. 2008) (recognizing that defense opening statement opens door to
admission of extraneous-offense evidence to rebut defensive theory raised in
the statement).  When the defensive theory of consent is raised in a
prosecution for sexual assault, the defendant necessarily disputes his intent
to engage in the alleged conduct without the complainant=s consent and places his intent at
issue.  Casey v. State, 215 S.W.3d 870, 880  (Tex. Crim. App. 2007);  Rubio
v. State, 607 S.W.2d 498, 501 (Tex. Crim. App. 1980).  Additionally,
evidence of a defendant=s modus operandi is a recognized exception to the
general rule precluding extraneous-offense evidence if the modus operandi
evidence tends to prove a material fact at issue, other than propensity.  Casey,
215 S.W.3d at 880; Martin, 173 S.W.3d at 467B68.  Consequently, the testimony of
the three women, indicating they were also drugged, was inherently probative to
demonstrate a modus operandi and prove appellant=s intent to facilitate non-consensual
intercourse with C.H. by drugging her.  See Martin, 173 S.W.3d at 464B68 (holding, in sexual assault case,
trial court did not violate Rule 404(b) by admitting evidence of another
unadjudicated sexual assault under similar circumstances as charged offense
because defendant raised defense of consent and evidence of other assault also
showed modus operandi).

Moreover, the State needed the testimony of the three women
because, as we have also discussed, there was no direct proof appellant drugged
C.H., requiring the State to rely on circumstantial evidence to establish this
fact.  As we have mentioned, proof that C.H. was unconscious, regardless of the
reason, was sufficient to establish lack of consent.  However, appellant
suggested C.H. lied about her lack of consciousness or did not recall consensual
intercourse due to heavy alcohol consumption.  Accordingly, evidence appellant
drugged C.H. was probative to proving she was indeed unconscious.  Thus, the
first and second factors weighed in favor admitting testimony of other women
who believed they were also drugged.  








With respect to counter-factors three, four, and five, the
testimony did not have a tendency to suggest decision on an improper basis, 
confuse or distract the jury from the main issues, or be given undue weight by
a jury that had not been equipped to evaluate the probative force of the
evidence.  Appellant apparently relies on these counter-factors because he
primarily argues that the suggestion these other women were drugged was
speculation.  However, because proof a defendant used drugs to facilitate
sexual assault might depend on circumstantial evidence, the trial court could
have concluded the women=s belief they were drugged was not necessarily speculation. 
Further, appellant=s concern was alleviated by the trial court=s subsequent instruction in the
charge that the jury could not consider the extraneous offenses for any purpose
unless it found beyond a reasonable doubt that appellant committed the offenses
and it could only consider the extraneous offenses in determining appellant=s motive, opportunity, intent, preparation,
plan, knowledge, identity, or absence of mistake or accident relative to the
charged offense.           

On the final counter-factor, we cannot conclude the testimony
consumed an inordinate amount of time or was merely repetitious of other
evidence.  The testimony of the three women consumed less than one volume of
approximately five volumes of testimony in the guilt-innocence phase. 
Nevertheless, to the extent the testimony consumed a fair amount of time, the
more women who relayed similar experiences simply increased the probative value
of the evidence to show appellant engaged in the same conduct toward C.H. 
Accordingly, the length of the testimony did not weigh in favor of exclusion.








In sum, we conclude the trial court did not abuse its
discretion by determining the probative value of the testimony of S.L., D.L.,
and E.C. was not substantially outweighed by the danger of unfair prejudice.  See
Casey, 215 S.W.3d at 882B84 (holding, where complainant was allegedly rendered
unconscious through date-rape drug, sexually assaulted, and photographed by
defendant, trial court did not abuse its discretion in overruling defendant=s Rule 403 objection to photographs
depicting another unconscious woman subjected to sex acts in same location and
positions as shown in photographs of complainant; although photographs would
generate emotional response, they were probative to rebut defendant=s consent theory, corroborate
complainant=s testimony, and demonstrate modus operandi).  We overrule
appellant=s third issue.  

Having
overruled appellant=s issues, we affirm the trial court=s judgment.

 

 

 

/s/        Charles W. Seymore

Justice

 

Panel consists of Justices
Seymore, Brown, and Sullivan.

Do Not Publish C Tex. R. App. P. 47.2(b).









[1]  In fact, the record indicates appellant deliberately
refrained from objecting to S.E.=s
testimony because he had already mentioned her in his opening statement, hoping
his forthright acknowledgment of her claim might minimize its potential effect
on the jury.





[2]  The court stated, AWell, I=ll overrule your objection.  It seems to me like since
this goes to proven (sic) element of the offense, if it does so, then it
certainly would go to make it even more less (sic) likely that that element
exists.  So I would overrule the objection.@